Clayton W. CLARK, Plaintiff–
Appellant,

v.

TAKATA CORPORATION, American Honda Motor Co., Inc., Honda Motor Co., Ltd., et al., Defendants–Appellees.

No. 98–1799.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1998.

Decided Sept. 24, 1999.

Jon D. Krahulik (argued), Yosha, Krahulik & Levy, Indianapolis, IN, for Plaintiff–Appellant.

Kenneth S. Geller (argued), Mayer, Brown & Platt, Washington, DC, for Defendants–Appellees.

Before COFFEY, MANION and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

On June 3, 1995, the plaintiff-appellant, Clayton W. Clark ("Clark"), while traveling in his 1991 Honda Accord on an interstate highway in Kentucky, was struck from behind by a second party driving a pickup truck. The impact caused Clark's vehicle to veer off the road and roll down an embankment. Clark sustained spinal cord injuries and sued Takata Corporation, American Honda Motor Co., Inc., Honda Motor Co., Ltd., Honda of America Manufacturing, Inc., and Honda R & D Co. Ltd.

(collectively, "the defendants"), alleging that his seat belt was defective because it became unlatched during the rollover, thereby allowing his head to strike the roof and cause his injuries. During trial, the district judge struck Clark's liability expert's testimony as well as an affidavit from an Emergency Medical Technician ("EMT") who assisted Clark at the scene of the accident. The defendants filed a motion for summary judgment, which the trial judge granted on March 5, 1998. Clark appeals the district court's grant of summary judgment, contending that the trial judge erred in striking Clark's expert's testimony and the affidavit of the EMT. We affirm.

## I. BACKGROUND

On June 3, 1995, the plaintiff Clark was driving his 1991 Honda Accord on Interstate 65 in the State of Kentucky while in the company of two passengers. Clark testified that he was restrained by two safety belts: a motorized shoulder belt which automatically engaged when he closed his car door and started the engine; and a separate lap belt that Clark testified that he manually fastened across his waist when he entered his vehicle.[1] At approximately 2 a.m., Clark's Honda was struck in the rear by a pickup truck which was driven by Jesse Froggett ("Froggett"), who was traveling approximately sixty-five miles per hour in the same direction as Clark. As a result of the impact, the Honda jumped the buried end of a guardrail and was catapulted down an embankment on the side of the highway, rolling over several times.

Immediately after the accident, Froggett drove to a nearby gas station and asked an employee to telephone the police and request an ambulance. Approximately five to six minutes after the accident occurred, Froggett returned to the scene from the gas station to find Clark's two

passengers wandering around in a daze near the top of the embankment about fifteen feet from the guardrail; both had been ejected from the Honda during the rollover. Froggett borrowed a flashlight from a passing motorist and walked down the embankment toward Clark's automobile, which was sitting in an upright position on its wheels at the bottom of the hill. Froggett immediately observed that Clark was still inside the vehicle and was leaning to the right, but in a relatively normal position, with his feet in front of him. Froggett was able to speak with Clark, but did not attempt to remove him from his vehicle. Approximately twenty minutes after the accident, three EMT's arrived and extracted Clark from the vehicle. Clark was taken to a nearby hospital, where doctors discovered that he had fractured two vertebrae and suffered permanent spinal cord injuries.

Almost one year later, on May 30, 1996, Clark filed suit against the defendants pursuant to the Kentucky Products Liability Act, KRS § 411.300, et seq. and KRS § 411.182, and asserted claims of negligence and strict liability in tort, contending that the "seat belt latching mechanism [on his lap belt] . . . failed and such failure caused [him] to become unrestrained and strike his head on the interior of the automobile" thereby causing him to suffer permanent and serious injury. Neither the plaintiff nor the defendants dispute that Clark's lap belt and shoulder harness were fastened and in place *before* the accident; instead, the contested issue boils down to whether the lap belt mechanism failed and became unlatched as the vehicle rolled down the embankment, causing the plaintiff to hit his head and suffer an injury, or whether the belt was latched when Clark was found *following* the rollover and was released by one of the people assisting him.

---

1. At the time of the accident, Clark's front seat passenger was wearing a shoulder harness, but no lap belt. The rear seat passenger was wearing neither a shoulder belt nor a lap belt.

At trial, Froggett, the first person on the scene, testified as follows:

Q: When you looked in the car with the flashlight, could you see if he was wearing a seat belt?

A: Yes.

Q: And was he?

A: Yes.

Q: Now, a seat belt has two portions, it has a shoulder portion that goes across the chest and a lap portion, a lap belt. Were both of these belts in place?

A: They appeared to be.

Q: And you were able to observe that with the flashlight?

A: Yes.

Q: Did the lap belt appear to be properly latched into the buckle?

A: I don't know.

Q: You didn't try and reach in and grab it or anything?

A: No.

Q: But from what you could see, it looked like it was in the proper location across his lap?

A: It was across his lap, yes.

The next people on the scene were the EMT's. Two of the EMT's testified that they had no recollection concerning the seat belt—specifically whether Clark's lap belt was fastened when they arrived at the accident scene or whether they had to unbuckle it in order to extricate Clark from the car. A third EMT, Melissa Hodson ("Hodson"), testified that she recalled unlatching the motorized shoulder harness, which was still in place, but did not remember anything about the lap belt. In particular, Hodson stated that she did not recall unlatching or cutting the lap belt away from Clark. The two passengers in the Honda, who were friends of Clark's, had no recollection concerning whether the plaintiff was wearing his lap belt following the accident. Finally, while Clark recalls latching his lap belt before driving his car on the night of the accident, he has absolutely no recollection regarding the position of the lap belt *following* the rollover. He further testified that prior to the accident, he never had difficulty buckling or using the lap belt, and as far as he recalled, it always functioned properly.

Clark retained Dr. James Lafferty, P.E., Ph.D. ("Lafferty"), to serve as an expert witness.[2] Pursuant to Federal Rule of Civil Procedure 26, Dr. Lafferty submitted an expert report which concluded that "[i]f Mr. Clark's lap belt had functioned properly, he would have been restrained from impacting the roof of the Honda and he would have had no serious injury in this accident." During a subsequent deposition, Lafferty again stated that Clark's head struck the roof of the car because the lap belt had become unlatched as the car was rolling down the embankment, though he gave no indication how he had arrived at this conclusion.

On October 16, 1997, the defendants filed a motion for summary judgment, arguing that Clark had failed to present admissible evidence to establish that the lap belt did not restrain him during the accident. On October 24, 1997, Clark attempted to create a genuine issue of material fact in opposition to the defendants' summary judgment motion by filing the affidavit of Dr. Lafferty "clarify[ing] his opinion" and restating his conclusion that the lap belt had malfunctioned by unfastening during the rollover. Lafferty's affidavit added the additional contention that the lack of blood on the lap belt, in comparison to the large amount of blood found on the shoulder harness and the driver's seat, "is inconsistent with the lap belt being buckled during and after the accident." Clark also submitted the affidavit of EMT Hodson which stated that "[i]t is [her]

**2.** According to his *curriculum vitae,* Dr. Lafferty has a Ph.D. in Mechanical Engineering from the University of Michigan and, at the time of the lawsuit, was Professor–Director Emeritus at the Graduate Center for Biomedical Engineering at the University of Kentucky and worked as a consultant in the field of Biomechanics and Mechanical Engineering.

belief ... that Mr. Clark's lap belt was not attached around his waist at any time from when [she] first arrived on the scene to and including his extraction from the automobile."

On November 7, 1997, the defendants filed a motion to strike the testimony of Dr. Lafferty from consideration, arguing that Lafferty failed to perform "the necessary research and testing to submit legitimate expert opinions" and that his testimony was therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The same day, the defendants filed a motion to strike the affidavit of EMT Hodson from consideration, arguing that the allegations made in Hodson's affidavit contradicted her previous deposition testimony and were thus unreliable.

On March 5, 1998, the district court granted the defendants' motion to strike the testimony of Dr. Lafferty because his opinions failed to meet the requisite level of reliability required by *Daubert,* which mandates that scientific testimony be not only relevant, but also reliable. The court also struck the Hodson affidavit from consideration because it was inconsistent with previous deposition testimony wherein Hodson denied recalling anything about the lap belt. After ruling this evidence inadmissible, the court determined that Clark "had come forward with no evidence that would establish that his lap belt came undone before or during the accident ... [,]" which was an essential element of his tort claim. Absent such proof, the trial judge granted the defendants' motion for summary judgment. Clark appeals.

## II. ISSUES

On appeal, the plaintiff contends that the district court wrongly granted summary judgment by abusing its discretion in: (1) striking from consideration the expert opinion of Dr. Lafferty; and (2) striking from consideration the affidavit of EMT Hodson.

## III. DISCUSSION

### A. *The Exclusion of Lafferty's Testimony and Affidavit*

Initially, Clark contends that the trial judge abused his discretion in striking from consideration the expert opinion of Lafferty. Clark argues that the statement of his expert creates a genuine issue of material fact sufficient to defeat the defendants' motion for summary judgment.

Lafferty, in his one and one-half page report, states that based upon his review of the pertinent medical records, Clark suffered a fracture dislocation at vertebrae C6 and C7 of his spinal column. Next, he estimates the amount of force necessary to cause Clark's injury (1000 pounds) and states that the injury occurred when Clark's head impacted the roof of the Honda during the rollover sequence. Lafferty goes on:

> If Mr. Clark's lap belt had functioned properly, he would have been restrained from impacting the roof of the Honda and he would have had no serious injury in this accident. From measurements made of Mr. Clark, I understand that his seated height is approximately 32 inches. The distance from the bottom of the seat cushion of the driver's seat of the Honda to the top of the head rest (restraint) is 32 inches. Thus, he had about four inches of clearance between the top of his head and the crushed roof of the car. A lap belt, therefore, would have prevented his neck injury.

In preparing his report, the record establishes that Lafferty failed to review testimony from Clark, testimony from witnesses on the scene of the accident (including the EMT's and Froggett), or testimony from Clark's passengers in the Honda vehicle. There is no indication in his report that Lafferty considered Clark's height or weight in drawing his conclusions. Moreover, Lafferty made no other measurements, such as how far the

front seat was reclined at the time of the accident or the extent to which the roof was crushed in the rollover, prior to submitting his report. However, Dr. Lafferty did perform a visual inspection of the Honda Accord and the driver's lap belt assembly prior to the preparation of the report.

Subsequent to the defendants' filing of their motion for summary judgment, on October 24, 1997, Lafferty filed an affidavit in response, alleging that

> [i]n order to clarify my opinion so that there can be no doubt about my opinion, I would like to re-state my professional opinion.... Based on my education, research, and experience in the fields of Biomechanics and Mechanical Engineering it is my professional opinion that had [Clark's] lap belt remained fastened, Clayton Clark would not have suffered serious injury.

In support of his contention that the lap belt became disengaged during the course of the rollover, Lafferty set forth a reason not mentioned in his previously submitted expert report: "[T]he relative lack of blood on the lap belt in comparison to the blood on the shoulder harness and the seat is inconsistent with the lap belt being buckled during and after the accident." On March 5, 1998, the district judge struck expert witness Lafferty's report and affidavit from consideration because they failed to meet the standard of evidentiary reliability of expert testimony explained in *Daubert*, which requires that scientific evidence be both relevant and reliable.

■■■ As the Supreme Court has stated repeatedly, we review the district judge's decision whether to admit or exclude expert testimony for an abuse of discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999); *see also General Electric Co. v.*

*Joiner*, 522 U.S. 136, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997). We are obligated to take cognisance of the fact that deference to the trial court's decision is the "hallmark" of abuse of discretion review. *Joiner*, 118 S.Ct. at 517 (citation omitted).

■■■ According to Federal Rule of Evidence 702, the district judge is required to function as a "gatekeeper" with respect to the screening of expert testimony. *Kumho*, 119 S.Ct. at 1174 (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). Rule 702 imposes "a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Id.* As the Supreme Court recently elaborated:

> The objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho*, 119 S.Ct. at 1176. It is axiomatic that proffered expert testimony must be "'derived by the scientific method[.]'" *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir.1997) (quoting *Daubert*, 509 U.S. at 590–91, 113 S.Ct. 2786).

■■ Lafferty's testimony boils down to two opinions: (1) the lap belt unbuckled during the rollover sequence; and (2) a properly functioning lap belt would have prevented Clark from moving upward four inches and striking the roof. Application of *Daubert* to an expert's proffered testimony requires the court to perform a two-step analysis. Initially, the court must determine whether the expert's testimony is reliable, that is, whether it is based on a reliable methodology.[3] *See Cummins v.*

---

**3.** *Daubert* set forth the familiar nonexhaustive list of four factors that are helpful in gauging the reliability of expert testimony: (1) whether the theory is scientific knowledge that will assist the trier of fact and can be tested; (2) whether the theory has been subjected to peer review or publication; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) the extent to which the methodology

*Lyle Indus.,* 93 F.3d 362, 368 (7th Cir. 1996); *see also Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Second, the court must decide "whether evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins,* 93 F.3d at 368 (internal citations and quotations omitted); *see also Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

 Initially, we consider whether Lafferty's conclusion that the lap belt became unbuckled during the rollover is helpful to the trier of fact. One problem with Lafferty's opinion, as recognized by the trial judge, is that Lafferty *assumes* as truth the very issue that Clark needs to *prove* in order to recover—that is, that the lap belt, though previously secure, became unlatched during the accident. At deposition, Lafferty admitted that he "didn't address" the question whether the lap belt became unlatched during the accident sequence and he had formulated *no independent opinion* as to whether the lap ·belt became unlatched during the accident sequence. The testimony, given in response to questioning by defense counsel, unfolded as follows:

Q: ... [Y]ou are assuming, based upon the facts that have been presented to you, that the lap belt unlatched and did not restrain [Clark] during the accident sequence; is that correct?

A: That's correct, sir.

Q: What evidence do you have available to you that the lap belt did, in fact, unlatch during the accident sequence?

A: I didn't address that question. I haven't considered it, so I have no opinion on that.

Q: You have been asked to assume that, then?

A: Yes, sir.

Q: But you cannot independently verify that?

or technique employed by the expert is generally accepted in the scientific community.

A: Oh, I might, but I haven't tried to.

The trial judge found that "[b]ecause Dr. Lafferty assumes the very fact that he has been hired to prove, his testimony is not helpful to the trier of fact in determining that same fact in issue." We agree. The crux of Clark's tort claim is that the lap belt buckle failed during the accident and thus was defective. A liability expert is only helpful to the fact finder if he is able to establish such an element of the claim through visual inspection, independent research, testing, and knowledge. Lafferty's unequivocal testimony clearly demonstrates that he has not proven this allegation; rather, he has *assumed* it to be true. We have held that a district court is required to rule out "subjective belief or unsupported speculation" by considering "whether the testimony has been subjected to the scientific method." *See Wintz,* 110 F.3d at 512 (internal citation and quotation omitted). An expert must " 'substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.' " *Huey v. United Parcel Serv., Inc.,* 165 F.3d 1084, 1087 (7th Cir.1999) (citing *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997)). Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve), and thus, the court's refusal to accept and give credence to Lafferty's opinion was proper.

 Dr. Lafferty's second contention is that a properly functioning lap belt would have prevented the plaintiff from moving upward four inches and striking the roof of the vehicle. The methodology Lafferty employed to arrive at this opinion is unclear at best. His deposition states:

Q: Dr. Lafferty, what have you done in order to formulate the opinions you're going to offer in this case?

*See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786.

A: ... I've done nothing more than inspect the vehicle and make the measurements that I made and review documents, primarily the medical records.

\* \* \* \* \* \* \* \*

Q: Have you conducted any testing, reenactments or demonstrations for this particular case?

A: Not for the purposes of my opinions, no, sir.

Q: Are you aware of any testing, reenactments or demonstrations from any prior work that you have done or that you are aware of and upon which you specifically rely in support of the opinions you will give in this case?

A: No, sir.

\* \* \* \* \* \* \* \*

Q: Dr. Lafferty, have you done any testing in an effort to duplicate the forces acting on the lap belt in this accident?

A: No, sir, I have not.

Q: Do you have an opinion about the forces that this lap belt and buckle experienced in this accident?

A: No, I don't. I could probably come up with an estimate, but I don't—I have no intention of doing that.

Q: ... Have you done any testing to document how far a person Mr. Clark's size would move off of the seat in this accident if the lap belt remained latched?

A: I've done no testing, no, sir.

\* \* \* \* \* \* \* \*

Q: What is your basis for saying that a properly functioning belt would keep him from reaching the roof rail?

A: The lap belt would hold him down.

Q: And what testing or data base do you rely upon in offering that opinion?

A: My experience.

Q: Is that it?

A: That's it.

Thus, according to Dr. Lafferty's testimony, his opinion (that a properly functioning lap belt would have prevented Clark from moving more than two inches off of his seat) is based solely on his belief and assumption without any scientific testing data or supporting research material in the record. In determining whether an expert's testimony is reliable, the *Daubert* factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on "experience" or "training." *See, e.g., Cummins,* 93 F.3d at 367 n. 2. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 118 S.Ct. at 519. Either "hands-on testing" or "review of experimental, statistical, or other scientific data generated by others in the field" may suffice as a reasonable methodology upon which to base an opinion. *Cummins,* 93 F.3d at 369.

The trial court rejected Lafferty's "four inches of movement" rationale because "it does not appear that Dr. Lafferty's opinions have been subjected to the scientific method." In fact, as illustrated by his deposition testimony, Lafferty conducted absolutely no scientific tests to determine the forces acting on the lap belt at the time immediately before and during the impact and rollover, including Clark's height, weight, and the force of the impact as related to the speed of the striking vehicle. Further, he failed to identify, much less offer, any evidence to support his conclusion that a lap belt, if properly fastened, could have stopped Clark from hitting the roof. It comes as no surprise that the district judge was "unable to determine what methodology or reasoning, if any, serves as the basis for Dr. Lafferty's opinions." Furthermore, though Lafferty claimed that a properly functioning lap belt could allow a driver to be propelled

from the seat in an upward movement no more than two inches, he made no tests and thus offered no testimony to establish the reliability of the two-inch figure. And though he claimed that others had tested the reliability of the two-inch figure, he stated "I don't think that's ever been measured" and could not identify any studies conducting such measurements. Apparently, there is no confirmation in the record to demonstrate that Lafferty's opinions were subjected to any sort of peer review. Lafferty cites several books he reviewed in preparing his report, but each recounts only very basic subject material. Given the state of the record, including the absence of any stated methodology, it is difficult for this Court to evaluate the scientific technique used by Dr. Lafferty in formulating his opinions. Thus, we sympathize with the trial judge's inability "to determine [if the] methods are consistent with the generally accepted method for gathering and evaluating evidence in the field of biomechanics and mechanical engineering as applied to occupant dynamics and restraint system efficacy in motor vehicle accidents." Dr. Lafferty's second opinion, that a properly functioning lap belt would have prevented Clark from moving upward four inches and striking the roof of the vehicle, lacked reliance on any "stated methodology" or the scientific method. *See Wintz*, 110 F.3d at 512. From our review of the record, it is more than evident that Lafferty failed to determine, among other things, the speed of the

vehicle as it tumbled down the hill, the intensity of the forces to which Clark was subjected, or the strength or flexion of the particular lap belt.[4] Under these circumstances, the trial court was well within its discretion to rule out Lafferty's opinion, which was connected to existing data only by the *ipse dixit*, or bare assertion, of the expert. *See Joiner*, 118 S.Ct. at 519. Where the proffered expert offers nothing more than a "bottom line" conclusion, he does not assist the trier of fact. *See Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318–19 (7th Cir.1996). We are convinced that the trial judge acted well within his broad discretion when he excluded Lafferty's expert opinions from consideration.[5]

### B. The Exclusion of the Affidavit of EMT Melissa Hodson

▮▮▮▮▮▮ The plaintiff Clark next contends that the trial judge erred by striking EMT Hodson's affidavit from consideration. During her deposition on March 27, 1997, Hodson testified as follows:

Q: Okay, do you remember whether either of [Clark's] safety belts . . . were buckled or engaged?

A: The only one I positively recall was his shoulder belt.

\* \* \* \* \* \* \* \*

Q: What do you remember, if anything, about the lap belt?

---

4. We note that the defendants' expert, Harry Smith, conducted three "surrogate driver and exemplar vehicle" analyses, two involving a Honda Accord similar to the accident vehicle and one involving another car. In two of these tests, the vehicles were mounted on "spits" and rotated in a test to determine how a driver of Clark's size would have moved during the rollover sequence. Smith also relied on published studies showing the gross kinematics of human bodies, both restrained and unrestrained by safety belts, when a vehicle experiences numerous rollovers. Smith concluded that if Clark had not been restrained by the lap belt, he would have been ejected from the car as were the two passengers in Clark's vehicle.

5. Clark devotes a substantial portion of his brief to convincing us that Dr. Lafferty is qualified to render opinions in this case. However, Lafferty's qualifications are not at issue—even the defendants admit he is qualified to serve as an expert—but qualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.

A: I don't recall anything. I don't recall actually cutting it or removing it.

Q: You do recall unbuckling or unlatching the shoulder belt?

A: Correct.

Q: Would you remember unbuckling the lap belt if you had done so?

A: Yes.

\* \* \* \* \* \* \* \*

Q: If I understand your testimony correctly about the lap belt ..., all you can say is that from the time you arrived, which was 20 minutes or more after you received the call, you do not personally recall unlatching that lap belt?

A: Correct.

On October 20, 1997, as part of Clark's response to the defendants' motion for summary judgment, he submitted an affidavit from EMT Hodson in which Hodson stated as follows:

4. I released the shoulder harness but I did not cut or otherwise release the lap belt from Mr. Clark.

7. Had Mr. Clark's lap belt been buckled around his waist, it would have been my responsibility to cut it in order to release it and I did not cut or release such lap belt. It is my belief based on my memory as well as my practice, custom and procedure, that Mr. Clark's lap belt was not attached around his waist at any time from when I first arrived on the scene to and including [his] extraction from the automobile.

The defendants moved to strike the affidavit from consideration during the summary judgment determination, and the trial court agreed and granted the motion to strike. The court found that Hodson's affidavit was inadmissible because it "clearly contradicted" her prior deposition testimony. The judge relied on *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir.1993), which held that "[a] party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject." We review a district court's decision to strike an affidavit for an abuse of discretion. *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir.1996).

■ In *Unterreiner*, the plaintiff testified during deposition that he had no recollection regarding whether an Age Discrimination in Employment Act notice was posted on his employer's bulletin board. More than one year later, the plaintiff filed an affidavit stating that no ADEA notice was posted on the bulletin board. This Court held that the affidavit did not create a genuine issue of material fact for purposes of summary judgment, stating that:

We have determined in this case that at some point a party who discounts his knowledge of a certain subject cannot create a "genuine" issue of fact by contradicting unequivocal testimony about the subject. [The Plaintiff] admits to a lack of recall about what was on the bulletin board. He cannot create a "genuine issue of material fact" by later testifying that there was no ADEA notice on the board.

*Unterreiner*, 8 F.3d at 1211. We have restated the holding in *Unterreiner* very recently: "[A]n affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable." *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 720 (7th Cir.1998). Hodson's affidavit suffers an identical fate to that in *Unterreiner*. At deposition, during questioning about the positioning of Clark's lap belt following the accident, Hodson stated, "I don't recall anything" about the belt. Hodson went on to note: "I don't recall actually cutting it or removing it[,]" and she did not recall unlatching the lap belt. The statement made in Hodson's affidavit, that "she did not cut or otherwise release the lap belt" is at least inconsistent with her prior sworn

testimony.[6] Because "[a] party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject[,]" *Unterreiner*, 8 F.3d at 1210, we hold that the trial court did not abuse its discretion in striking EMT Hodson's affidavit from consideration at the summary judgment proceeding.

## IV. CONCLUSION

We hold that the district court's grant of summary judgment was proper; the court properly excluded the expert opinion of Dr. Lafferty because it failed to meet the requirements set forth in Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert*. Moreover, the court did not abuse its discretion in striking the affidavit of EMT Hodson because the content of the affidavit was inconsistent with her earlier deposition testimony.

AFFIRMED.

---

6. Even had this affidavit been submitted to the jury, we are of the opinion that it would not have carried the day for Clark as it is clearly inconsistent with her prior testimony.